UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWSON PRODUCTS, INC., | |
| Plaintiff, | No. 23 CV 5314 |
| v. | Judge Manish S. Shah |
| MICHAEL MORICHELLI, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lawson Products, Inc. distributes products and services to the industrial, commercial, institutional, and governmental maintenance, repair, and operations market. Defendant Michael Morichelli worked for Lawson as a sales representative from 2020 to 2023. At the start of his employment with Lawson, Morichelli signed a Loyalty and Confidentiality Agreement that included a customer non-solicitation covenant. Morichelli left Lawson in March 2023 to start his own maintenance, repair, and operations company. He then solicited customers that fell within the non-solicitation covenant. Lawson seeks a preliminary injunction to enforce the non-solicitation contract.

**I.     Legal Standards**

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (quoting *Winter*, 555 U.S. at 7).

## II. Facts

Lawson distributes products and services to the industrial, commercial, institutional, and governmental maintenance, repair, and operations market. [6-1] at 2, 25.[1] Companies like Lawson compete to supply a wide range of goods such as fasteners, cutting tools, and chemicals to their customers. [15-1] ¶ 2; [6-1] at 2, 25. Products are uniform across the maintenance, repair, and operations industry and are frequently ordered from the same handful of large manufacturers. [15-1] ¶ 3.

Lawson uses a "vendor-managed inventory" approach to sales. [6-1] at 26. Vendor-managed inventory services are designed to generate repeat, long-term business and to help ensure that customers optimize their inventory levels. [6-1] at 26. A crucial part of Lawson's vendor-managed inventory model is the relationship between the customer and local employee sales representative, who has direct customer access and, within Lawson, account exclusivity. [6-1] at 4, 26.

Morichelli began working for a maintenance, repair, and operations company called Partsmaster in August 2016 as a sales representative. [15-1] ¶ 8. Lawson acquired Partsmaster in September 2020. [6-1] at 2. At the start of his employment with Lawson, Morichelli signed a Loyalty and Confidentiality Agreement that included a customer non-solicitation covenant:

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed on the top of filings, except in the case of citations to a transcript, which use the transcript's original page number, or to a document with numbered paragraphs, which cite to the paragraph.

> Employee agrees that for eighteen (18) months following the end of Employee's employment with Company, Employee will not directly or indirectly interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: (i) stop or reduce doing business with Company, or (ii) buy a Conflicting Product or Service, unless a duly authorized Company officer gives Employee written authorization to do so. Employee agrees that direct interference includes, for example, selling a Conflicting Product or Service to a Covered Customer, or soliciting such a sale. … The parties agree this restriction is inherently reasonable because it is limited to the places or locations where the Covered Customer is doing business at the time.

[6-1] at 35. "Covered Customer" was any customer to which Morichelli made sales or solicited in the last twelve months of his employment at Lawson. [6-1] at 34.

In his role at Lawson, Morichelli was responsible for developing existing customers and cultivating prospects in his territory. [6-1] at 39. As part of the sales process, Morichelli assisted customers with inventory replenishment needs, organized and maintained product bins and cabinets, and provided technical expertise on Lawson products. [6-1] at 4.

In March 2023, Morichelli left Lawson and began his own maintenance, repair, and operations company, Seminole Supplies & Solutions, LLC. [15-1] ¶¶ 34–35. Morichelli has solicited at least six covered customers since leaving Lawson.[2] [6-1] at 5–6, 11–12, 17–19, 21–22. Morichelli also serviced Lawson customers on behalf of Seminole before he resigned. [28-1] at 101:20–24; 103:13–17; 122:12–23.

---

[2] When questioned which covered customers he sold to on behalf of Seminole, Morichelli listed 23 customers. [28-1] at 113:7–25. However, later testimony called into question whether Morichelli was listing accounts he sold to on behalf of Lawson as compared to those he sold to at Seminole. [28-1] at 120:23–121:21.

3

### III. Analysis

#### A. Likelihood of Success on the Merits

Lawson doesn't need to show that it will definitely win, but Lawson must show that it "is likely to succeed on the merits." *See Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Winter*, 555 U.S. at 20). At the center of this case is Lawson's claim that Morichelli has violated the restrictive covenant in his employment agreement with Lawson. Lawson has presented evidence that Morichelli solicited at least six covered customers. [6-1] at 5–6, 11–12, 17–19, 21–22. Morichelli does not dispute this evidence; rather, he argues that Lawson's covenant is unenforceable. [15] at 7.

Illinois uses a "rule of reasonableness test" to determine the enforceability of a restrictive covenant. *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 17. A restraint on trade is reasonable only if it: (1) is no greater than is required to protect a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *Id.* Further, the activity, time, and geographic restrictions must be reasonable. *Id.* Covenants which limit solicitation of specific customers are "subject to a lower degree of scrutiny than an agreement which prohibits [an individual] from engaging in any type of competition." *Abbott-Interfast Corp. v. Harkabus*, 250 Ill.App.3d 13, 18 (2d Dist. 1993).

##### 1. Legitimate Business Interest

Whether a legitimate business interest exists is based on the totality of the circumstances, and a court considers the following non-exhaustive factors: the employee's acquisition of confidential information through their employment, the near permanence of customer relationships, and time and place restrictions. *Reliable*

4

*Fire*, 2011 IL 111871, ¶ 43. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case. *Id.*

Lawson alleges that Morichelli is using confidential informational—the prices he elected to charge covered customers—to undercut Lawson and undermine Lawson's reputation with covered customers. [1] ¶ 62; *see* [6] at 8. There is some evidence that Morichelli, on behalf of Seminole, charged at least one covered customer lower prices than what he charged the customer when at Lawson. [6-1] at 6. Customer information which is known by others in the trade or could be easily duplicated is generally insufficient to establish a legitimate business interest. *Dent Wizard*, 2021 IL App (2d) 200574-U, ¶ 28 (unreleased for publication in permanent law reports and subject to change until published) (citing *Lifetec, Inc. v. Edwards*, 377 Ill.App.3d 260, 269 (2007)). There is no evidence suggesting that Lawson's pricing was categorically different from others in the industry, or that the information could not be readily obtained by asking a covered client what Lawson was charging them. *Id.* ¶ 29 (citing cases finding pricing was not confidential information). Lawson's legitimate business interest is not based on confidential customer information.

As for the near permanence of Lawson's customers relationship, Illinois courts generally focus on the amount of resources invested in procuring and retaining customers, the length of a customer relationship, whether a business engendered customer loyalty by providing a unique product or personal service, and the exclusivity of the customer and business, among other factors. *Id.* ¶ 24 (quoting *Audio*

5

*Properties, Inc. v. Kovach*, 275 Ill.App.3d 145, 148–49 (1995)) (citing *Lawrence & Allen, Inc. v. Cambridge Human Resource Group., Inc.*, 292 Ill.App.3d 131, 142 (1997)). The maintenance, repair, and operations market is competitive; several companies solicit business from the same customers. [28-1] at 48:20–23; [15-2] ¶ 7; [15-3] ¶ 5. None of the covered customers were exclusively buying from Lawson. [28-1] at 48:20–23. The evidence suggests that it was largely the skill of the sales representative soliciting the client that determined the length of the relationship. *See* [15-1] ¶ 8–10; [28-1] at 74:13–16; [15-2] ¶ 8; [15-4] ¶ 4. Additionally, there is little evidence suggesting that the process of obtaining new customers was particularly expensive or difficult.

But while the confidential information and near-permanence factors don't neatly support Lawson's claim of a business interest protectible through a restrictive covenant, Lawson has established that it has a legitimate business interest in its customer relationships. Lawson used a vendor-managed inventory model that aimed to build a deep connection between the company and the customer, by encouraging a sales employee to partner with the customer to prevent machine breakdown, ensure optimal inventory levels, and ensure product training. [28-1] at 55:23–56:20, 73:2–13, 79:1–80:13. This approach was different from other companies' customer service. [28-1] at 59:20–60:15. When Lawson acquired Partsmaster, it broadened the types of products that sales employees could offer to customers. [28-1] at 61:14–62:21; [6-1] at 2–3, 27. Lawson's offering of products allowed sales employees to develop more complete relationships in order to have Lawson be a one-stop shop for maintenance,

6

repair, and operations products. [28-1] at 61:14–62:21; [6-1] at 26. Lawson had extensive distribution and warehouse capabilities that enabled prompt order fulfillment. [6-1] at 26. Lawson gave its representatives access to OrderPad, which allowed for on-site order entry and enabled sales employees to see average company pricing for a product, commission rates based on product price quotes, and alternative products that may benefit a customer. [28-1] at 8:25–10:7; 52:16–53:16. Morichelli's top accounts were repeat buyers of Lawson's products. [6-1] at 4.

Lawson's efforts in building a relationship through vendor-managed inventory may be not much more than dressed-up sales, but it is more. And its operational support to its sales team amounts to an investment and interest beyond just sending a traveling salesperson out in the world with a sample kit and a catalog. Considering the totality of the circumstances and the preliminary stage of the proceedings, Lawson has established a legitimate business interest in preserving its customer relationships with the covered customers. The scope of the non-solicitation agreement is not greater than necessary to protect Lawson's legitimate business interest. *See Dent Wizard*, 2021 IL App (2d) 200574-U, ¶ 31. The restriction is limited to eighteen months after the termination of the agreement and only prohibits Morichelli from soliciting customers that he worked with in the last year of his employment at Lawson.[3] [6-1] at 34–35.

---

[3] Morichelli argues that the covenant is not narrowly tailored because Lawson has not pursued all 54 covered customers through a vendor-managed inventory approach and deemed some of the covered customers as "minimal accounts" since Morichelli left. [30] at 6–7 (citing [28-1] at 39:15–19; [6-1] ¶¶ 36–37). Whether Lawson continues to pursue these covered customers with the same approach after the departure of their sales representative sheds little light on whether Lawson has a legitimate business interest in the covered customers.

>   2.   *Undue Hardship & Public Injury*

The undue hardship inquiry focuses on whether a restriction unreasonably limits an employee's ability to work, and covenants injure the public when they violate public policy. *See Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill.2d 52, 64–69, 76–77 (2006).

The non-solicitation clause does not place an undue hardship on Morichelli. The clause is limited to a specific set of customers and limited to only eighteen months. [6-1] at 34–35. The clause does not prevent Morichelli from continuing his business with other customers. Although Morichelli contends that an injunction will force him to close his company, the evidence shows that Morichelli is an experienced salesperson who can bring in new clients. *See* [28-1] at 83:17–19.

The evidence further suggests that the maintenance, repair, and operations market near Tallahassee, Florida, is extensive. Lawson has submitted a report that suggests there are at least 22,000 potential customers with estimated maintenance, repair, and operations market expenditures of more than $160 million. [28-2] ¶ 13. Morichelli contests the inclusion of this report after the evidentiary hearing, [30] at 9, because the parties stipulated to an express limitation on the universe of sworn statements, [18] ¶ 2. Morichelli also questions the value of the report as there is no way to know how accurate the total demand is, whether the listed entities have maintenance, repair, and operations needs, or whether it includes product lines that Morichelli does not offer. [30] at 9–10. Morichelli argues that this report cannot be used to rebut Morichelli's statement that if he is enjoined, he will go out business. [30] at 10 (citing [28-1] at 99:3–7).

8

Even though Lawson's report is subject to critique, it is responsive to my post-hearing question about the relevant market and I consider it. Morichelli had an opportunity to respond to my post-hearing question and the parties' agreement did not prohibit me from asking for more information. In any event, the report is consistent with the evidence presented at the hearing: there are many other customers available to Morichelli outside of those that fall under the covenant and Morichelli has the skills to solicit them. *See* [6-1] at 6 ("The total number of customers to whom Morichelli sold for Lawson is a small fraction of the total potential customers available to him now."); [28-1] at 83:17–19. Given the limited restrictions of the provision, the non-solicitation requirement set forth in the agreement does not cause Morichelli an undue burden nor is it injurious to the public. *See Quality Trans. Servs., Inc. v. Mark Thompson Trucking, Inc.*, 2017 IL App (3d) 160761, ¶ 32.

## B. Irreparable Harm

Lawson must show that it will suffer irreparable injury without a preliminary injunction. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Harm is irreparable if legal remedies are "seriously deficient as compared to the harm suffered." *Id.* Lawson alleges that its harms include loss of sales to customers and damage to relationships with customers. *See* [6] at 11–12.

Loss of customer relationships, loss of revenue, and harm to customer goodwill can all be irreparable injuries. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (consumer goodwill); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) (sales and opportunities to maintain and develop

customer relationships); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). Whether lost customers and contracts can be cured by legal remedies depends on whether those losses can be identified. *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022) (quoting *Life Spine*, 8 F.4th at 546).

Lawson argues that lost sales, which are traceable to Morichelli's violation of the non-solicitation covenant, invariably qualify as irreparable harm. [6] at 12. Morichelli counters that lost sales generally do not constitute irreparable harm, particularly when business records enable Lawson to calculate the amount of lost sales. [15] at 14; [30] at 8.

The parties here can identify the covered customers and calculate the extent to which they shifted their business from Lawson to Morichelli following Morichelli's departure from Lawson. There are approximately 54 covered customers. [28-1] at 45:19–23. Lawson has identified at least six covered customers who Morichelli has solicited or from whom he successfully transferred business to Seminole. [6-1] at 5–6, 11–12, 17–19, 21–22. According to Morichelli, he maintains a ledger containing all the sales he has made, and his margins are easily discernable. [30] at 8. Morichelli has posited a straightforward method for quantifying the financial harm to Lawson that is traceable to Morichelli's allegedly wrongful solicitation of the covered customers.

Lawson has not meaningfully contested the quantifiability of those losses. Lawson argues that it will be difficult to calculate any loss associated with Morichelli's ongoing solicitation efforts because Lawson cannot prove how long a

10

repeat account might have stayed with Lawson but for Morichelli's breach. [6] at 12. But a reasonable estimate is not beyond Lawson's reach. *See DM Trans*, 38 F.4th at 620 ("A district court is within its discretion to find an adequate remedy at law, and thus no irreparable harm, where the corporation seeking injunctive relief can reasonably estimate the value of its lost profits") (citing *Lawson Prods. v. Avnet*, 782 F.2d 1429, 1440 (7th Cir. 1986)). Lawson's difficulties in determining exact damages does not mean monetary damages are inadequate to cure Lawson's harm. *See Life Spine*, 8 F.4th at 545 ("Harm is irreparable if legal remedies are inadequate to cure it. Inadequate 'does not mean wholly ineffectual: rather, the remedy must be seriously deficient as compared to the harm suffered.'") (quoting *Foodcomm*, 328 F.3d at 304)).

Lawson also argues that Morichelli is in a position to impair the customer goodwill he cultivated as a Lawson sales representative, and that Lawson cannot assess whether Morichelli's interference might encourage customers to turn to another supplier other than Lawson or Morichelli. [6] at 12. But these lost sales do not support a showing of irreparable harm under the circumstances presented here. *See DM Trans*, 38 F.4th at 619–20 (holding that "lost opportunities" that translate into lost profits cannot support a showing of irreparable harm.) "The type of harm [Lawson] alleges would ultimately translate into lost profits." *See id.* With discovery, Lawson can identify when Morichelli has solicited a covered customer and it caused them to stop buying from Lawson. Lawson can then reasonably estimate loss profits resulting from this solicitation.

11

Because Lawson can reasonably estimate the value of its lost profits resulting from Morichelli's solicitation of covered customers, there is adequate remedy at law and Lawson faces no irreparable harm. *See id.* at 620 (citing *Lawson Prods.*, 782 F.2d at 1440).

The harm in this dispute over sales is almost entirely about money, and a damages remedy is adequate. Lawson points out that Morichelli's pitch to covered customers included criticisms of Lawson's pricing. [22] at 4–5. This could damage Lawson's reputation when competing against Morichelli and others. Reputational harm is difficult to quantify, *Stuller*, 695 F.3d at 680, but on balance this concern is a smaller piece of the puzzle here and doesn't warrant the extraordinary relief of a preliminary injunction.

### C.  Balance of Equities and Public Interest

The injunction Lawson wants would restrain Morichelli from directly or indirectly soliciting orders from or selling to those customers that Morichelli solicited or sold to during the last twelve months of his employment with Lawson, for products competitive with those distributed by Lawson. [1] at 13–14.

Lawson has made a strong showing on the merits for its breach of contract claim against Morichelli. Lawson's showing of irreparable harm is less persuasive. It seems likely that most of Lawson's alleged losses can be remedied through damages. *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 648 n.8 (7th Cir. 2011) (damages don't need to be proven with precision). Even if Lawson were able to show irreparable harm, given the limited customers at issue under the contract, revenue

12

and customer losses aren't as irreparable in this case as in others, and caution is warranted based on the sliding scale of harms.

Morichelli argues that granting the injunction will necessarily force his company to permanently fold and result in personal financial losses. [28-1] at 99:3–7. But an injunction centered on the covered customers won't necessarily do that. Any harm to Morichelli caused by requiring him to honor his obligations to avoid soliciting covered customers may be significant, but it would derive entirely from his breach of contract. The harm to Morichelli is self-inflicted, and the public interest favors the enforcement of contracts. Morichelli has presented evidence that he is a successful sales representative and was able to bring in many accounts to Partsmaster. *See* [28-1] at 83:17–19. The requested injunction would not prevent him from earning a living. *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015).

Nevertheless, the harm to Lawson can be adequately remedied through monetary damages, even if imprecisely. For that reason, plaintiff's motion for a preliminary injunction, [5], is denied.

ENTER:

/s/ Manish S. Shah
Manish S. Shah
United States District Judge

Date: December 14, 2023